UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
CAROL A. BULLARD, a/k/a ASHA BANDELE,

                           *Plaintiff,*                  **COMPLAINT**

          -against-                       Jury Trial Demanded

DRUG POLICY ALLIANCE,
MARIA MCFARLAND, and
JAMES FERGUSON

                           *Defendants.*
-------------------------------------------------------------------X

       Carol A. Bullard, a/k/a Asha Bandele ("Bandele"), by and through undersigned counsel, as and for her Complaint in this action against Defendant Drug Policy Alliance ("DPA"), respectfully sets forth and alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action for discrimination on the basis of Bandele's race, sex and gender in violation of Federal, New York State, and New York City civil and human rights laws as further described herein.

2. Bandele, an African American woman, worked for thirteen years for DPA. In November of 2015, she was promoted to Senior Director of Grants, Programs, and Special Projects. Her performance evaluations indicated that her work was outstanding and exceeded expectations. Yet, her work was undermined in ways that similarly situated white and male employees were not subject to (including, but not limited to: i. having a junior white employee dispatched to provide direction on a project that was helmed by Bandele, that the junior employee had not been involved with; ii. disrupting the approved and independently funded project during its critical final phase before its launch in order to

conduct a substantive review of it but making not a single substantive change to the project when allowing the project to resume;  and iii. excluding Bandele and the members of her team, all of whom were African American or Afro-Latina, from a DPA presentation on Bandele's project after it was complete).  Bandele repeatedly reported to her supervisor her concerns that she was being treated differently because of her race—to no avail.

3.  Bandele was terminated without warning on May 21, 2018, at roughly 1:30 p.m. E.T. for conduct that had been recommended by a DPA team in early 2016, approved in mid-2016 by DPA's then Deputy Executive Director, the then Executive Director, and the Chief Financial Officer. This conduct, hiring a journalist as a consultant to report on drug policy issues, was reported to McFarland and other members of the newly-installed executive team in October of 2017.  No one had advised Bandele that there was any question about the propriety of this conduct prior to the date of her termination. Further the ongoing relationship with the journalist was approved in a work plan submitted in late 2017 by Bandele to her direct supervisor, and then given final approval by McFarland, DPA's current executive director, in January of 2018.  At every point in the relationship with the journalist—from its initial suggestion by a team led by the former deputy executive director in January of 2016 and continuing through to the day Bandele was terminated—Bandele followed every single protocol on fiscal and narrative reporting made available to staff. She made decisions collectively with colleagues on her team and across the organization and whomever her supervisor was at the time, recommended contracts for work with the journalist that were aligned with the recommendations by her colleagues and supervisor, and utilized DPA's approval process to begin executing work.

2

4.  The hiring of the Black journalist was aligned with DPA's long-standing practice, which pre-dated Bandele's employment, of funding media outlets to write about drug policy. Further, DPA, for the entire length of Bandele's tenure, had approved spending monies from its grants program—the governing body of which is comprised of those who represent DPA's key funder, Open Society Foundations, members of the Board and the executive director—to specifically support the salaries of white male journalists.  Bandele had no vote in those decisions and none of the media outlets that were funded by DPA's grants committee were chosen at Bandele's instigation. They had pre-existing relationships with the organization and the organization saw value in supporting their work to the maximum extent it could and in a way that was most beneficial for both entities.  In the instant matter concerning Bandele, DPA's grants program was not used to fund the journalist.  Rather, her funding arose as part of Bandele's new portfolio, which sought, in part, to utilize Bandele's knowledge of media and strategic communications. Additionally, the funder, Open Philanthropy, whose monies were the primary source for the work with the journalist, approved of the expense and effort after a budget was submitted that similarly, went through a review process that included but was not limited to, the then executive director, deputy executive director, managing director of development and managing director of communications. The funding covered work that was to be executed from the period beginning at or about the end of February 2017 and continuing through the end of February 2019.

5.  Despite the fact that the decision to hire the journalist to report on drug policy issues was executed through the existing and appropriate chain of command, had full approval, and the contractual relationship with the journalist had been announced throughout the

3

organization by Bandele's then-supervisor in December, 2016 (and indeed was disclosed to the public on multiple occasions through social media, including but not limited to social media cards and live-streamed announcements to which all of DPA and the public at large were invited), none of the male or non-Black employees involved in the decision were terminated or otherwise penalized over it. Nor have any male employees or employees of another race been terminated or penalized in connection with DPA funding white journalists (and media outlets with predominately white audiences) to report on drug policy issues.

6. Furthermore, whereas the Defendants have consistently provided male employees and non-Black employees suspected of wrongdoing not only due process, but often an opportunity to rehabilitate or to respond to allegations made against them, Bandele was terminated without an investigation and without an opportunity to respond to the allegations of wrongdoing.

7. Bandele was locked out of her office prior to being confronted and terminated. She was advised that, absent prior written permission, she could not contact anyone on the staff— some of whom she had been friends with for as long as thirteen years. This was not done to similarly situated white and male employees terminated by DPA.

8. By 1:55 p.m. on May 21, 2018, within minutes of DPA's attorney offering Bandele a severance package that included a confidentiality agreement, DPA, through McFarland, advised persons outside of DPA that Bandele had been fired for misusing funds—an allegation that was not substantiated and was not true. Again, this conduct is contrary to how similarly situated male employees and white employees terminated by DPA have been treated.

## **NATURE OF THE CLAIMS**

9.  This action is brought to remedy discrimination on the basis of race, sex and gender in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290 et seq., and the Administrative Code of the City of New York §§ 8-101 et seq. (the "NYCHRL").

## **PARTIES**

10. Bandele is an African American woman who was employed by DPA from April of 2005 until her termination on May 21, 2018. Bandele is a resident of Brooklyn, New York. At all relevant times, she met the definition of "employee" under all applicable statutes.

11. Defendant DPA is a non-profit organization. Its mission "is to advance those policies and attitudes that best reduce the harms of both drug use and drug prohibition, and to promote the sovereignty of individuals over their minds and bodies."[1] Its office where Bandele was employed is located at: 131 West 33rd Street, 15th Floor, New York, New York 10001. DPA meets the definition of an "employer" under all relevant statutes.

12. Defendant Maria McFarland ("McFarland") is an individual who, upon information and belief, resides in Brooklyn, New York. At all times relevant to this Complaint, McFarland was employed by DPA. McFarland is being sued in her capacity as a representative of DPA and as an individual. McFarland became the Executive Director of DPA in November of 2017. As the Executive Director of DPA, McFarland had authority over Bandele and Bandele's supervisor. During all relevant times McFarland actively, willfully and knowingly engaged in illegal conduct with respect to Bandele.

13. Defendant James Ferguson ("Ferguson") is an individual who, upon information and belief, resides in North Carolina. At all times relevant to the Complaint, Ferguson was employed by DPA. Ferguson is being sued in his capacity as a representative of DPA and as an individual. Upon information and belief, Ferguson was a member of the Board of DPA at all relevant times. During all relevant times Ferguson actively, willfully, and knowingly engaged in illegal conduct with respect to Bandele.

---

[1] Drug Policy Alliance, "About Us", available at: http://www.drugpolicy.org/about-us#vision-mission (Last visited on July 25, 2018).

## JURISDICTION AND VENUE

14. Bandele filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 520-2018-03986, on or about May 22, 2018, complaining of the acts of race and sex discrimination alleged herein. Bandele has filed the instant action within 90 days from receipt of the Notice of Right to Sue issued by the EEOC on or about August 28, 2018.

15. Pursuant to New York City Law, Plaintiff has served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

16. The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the New York State and City Law claims pursuant to 28 U.S.C. § 1367.

17. DPA maintains an office in Manhattan where Bandele and McFarland were based during times relevant to this Complaint and in which a number of the unlawful practices complained of herein occurred. Accordingly, venue is proper within the U.S. District for the Southern District of New York.

## FACTUAL ALLEGATIONS

18. For most of Bandele's thirteen years of employment at DPA, Bandele was responsible for building, managing and maintaining the organization's Advocacy Grants program.

19. Bandele, who worked at DPA from April of 2005 until May 21, 2018, was promoted in November of 2015 to the position of Senior Director, Grants, Partnerships and Special Projects.

20. Bandele's performance evaluations noted her work was outstanding and exceeded expectations and detailed her notable achievements—including, but not limited to the conduct for which she was terminated without being afforded the same due process other similarly situated employees who were not Black females, were afforded. Her performance evaluations also commended Bandele for, *inter alia,* co-producing a video by Jay Z and Molly Crabapple. Thanks to Bandele the video was released through The New York Times, making it, according to her supervisor, "an Internet sensation, DPA's most watched video by far."[2]

21. After her promotion, Bandele coproduced a major Black Lives Matter Town Hall at DPA's Reform Conference in 2015. According to her supervisor, the town hall was "arguably the single most impactful event of the entire conference." Id., p. 4. More than half the conference attended the town hall.

22. Bandele also collaborated with DPA's California office and with Revolve, Inc. to secure major celebrity support for passage of California's ballot initiative to legalize marijuana.

23. Her achievements at DPA also include securing funding for the largest grant DPA had achieved-- $1.4 million from Open Philanthropy. In addition to ensuring the second largest foundation grant in the history of DPA, Bandele also secured a $150,000 donation from a new donor, Wellspring Philanthropic Advisors, and was positioned to secure more funds at the time of her termination.

24. Bandele also conceived, planned and, in March of 2018, led a delegation of seventy advocates, allies and journalists to Portugal, where they could observe, *inter alia*

---

[2] Bandele's Performance Evaluation for FY16, p. 3.

"[w]hat… Portugal [has] learned since they implemented the decriminalization of all drugs in 2001."[3]

**Executive Director's Attacks Against Bandele.**

25. Beginning in November of 2017, just after Defendant McFarland assumed the helm of DPA as the Executive Director, McFarland initiated a series of racially biased attacks against Bandele.

26. Specifically, Bandele had written posts challenging white supremacy on social media. DPA regularly and publicly challenges racism from members of staff at all levels of the organization on social media, in policy and published articles. Bandele's posts were not ascribed to the DPA and did not purport to express the views of the DPA. Rather, these social media posts denouncing white supremacy were only attributable to Bandele, who at the time of the postings, was already a best-selling and well-known author and writer who covered issues of race.  At the time of the posting, Bandele was preparing for the launch of a book she coauthored, entitled "When They Call You a Terrorist: A Black Lives Matter Memoir."[4] Nevertheless, McFarland reprimanded Bandele for writing these posts and ordered her to defend them and assert that they were not about DPA. Bandele complained to her supervisor and to DPA's Human Resource's manager about McFarland's actions.

27. Additionally, Bandele had raised funding for a specific DPA project: to lead a delegation of approximately seventy advocates, allies, and journalists to Portugal. The purpose of

---

[3] See Drug Policy Alliance Press Release, "U.S. Delegation Heads to Portugal March 19 – 22 to Learn from Country's Groundbreaking Drug Decriminalization Policy" (March 7, 2018) (Last visited July 26, 2018), Available at: http://www.drugpolicy.org/press-release/2018/03/us-delegation-heads-portugal-march-19-22-learn-countrys-groundbreaking-drug (hereafter "Portugal Delegation Press Release").
[4] Co-authored with Patrisse Khan-Cullors, published by Deckle Edge on January 16, 2018.

the project was educational—it would raise awareness of the results of Portugal's decriminalization of drugs, including, *inter alia,* the effect of Portugal's law on the number of deaths from drug overdoses. Bandele's project had been approved by DPA officials. Yet in an attempt to undermine Bandele and attack her credibility within DPA, McFarland fully put the project on hold for nearly a month in the critical final quarter before its execution. McFarland asserted that she did not understand the project and wanted it to be properly reviewed, despite its longstanding approvals, repeated and involved presentations to her by Bandele, and numerous others' ability to understand the project and its goals, including those who had contributed significant funding for the project. When it was finally allowed to move forward (the delegation traveled to Portugal in March of 2018[5]), McFarland had made not a single substantive change. Moreover, although the project had been Bandele's idea and she had been put in charge of a team to carry out the project, and despite Bandele having worked for DPA for approximately thirteen years, McFarland dispatched a white junior staff member, who was not otherwise involved with Bandele's project, to provide direction to Bandele about significant elements of the project—without even consulting with Bandele, and despite McFarland's oft-stated confusion about the goals of the project. No other similarly situated and male or non-Black staff was subjected to behavior such as this.

28. Later, McFarland reported to the Board of DPA on the project with no acknowledgement of the work that Bandele and her team—whose members were all Black or Afro-Latina— had done. Following that, McFarland's subordinate, Bandele's direct supervisor, convened an all-policy team conference about feedback on the project without seeking to

---

[5] See Portugal Delegation Press Release.

include either Bandele or a member of Bandele's team. Bandele was not advised that the meeting was to take place, let alone invited to participate via teleconference. Neither Bandele nor any members of her team had been advised that their project was to be discussed at the meeting. In contrast, white staff members (who were not involved with the project) were invited to the meeting and were given full opportunity to present their own work at the meeting. Bandele consistently spoke with her direct supervisor about about the discriminatory behavior she was receiving in the workplace. However, complaints to her supervisor about racism and the undermining of her work and leadership were rebuffed.

**Termination.**

29. On May 21, 2018, DPA terminated Bandele's employment for hiring Kirsten West Savali ("West Savali") (a Black writer), to create original content that advanced the issue of drug policy in the Black community. The hiring of West Savali was noted in Bandele's performance evaluations, was lawful, ethical, sanctioned and advanced by a team lead by the former deputy executive director, Stephen Gutwillig ("Gutwillig"). Gutwillig, along with DPA's previous Executive Director (Ethan Nadelmann) and the current Chief Financial Officer (Osmany "Ryan" Chavez) all reviewed and approved of this hiring plan as early as 2016. It was also later approved by the funder (Open Philanthropy) involved in supporting the expansion of Bandele's work with journalists, by Bandele's then supervisor (Widney Brown) and by McFarland, who approved the efforts in a work plan submitted in January of 2018.

30. For years, DPA had been providing funding for white persons in the media industry, as well as media outlets that were led by whites and had predominately white audiences, to report on drug policy issues. (For instance, DPA's grants program repeatedly approved monies that went towards the salary of Phil Smith, a white reporter. Smith would report on issues related to drug policy, DPA's work and its staff—including reporting on McFarland. Additionally, per discussions that included McFarland, DPA hired a white producer, Leigh Blake ["Blake"], for the preparation of a video regarding drug overdoses and the decriminalization of drugs in Portugal. A video was released in April of 2018 through Mic.com without any reference to sponsorship and at the point of Bandele's termination, DPA continued to engage Blake.)

31. In January of 2016, DPA's newly formed Criminal Justice Reform team conducted its first meeting. Bandele participated in this meeting as a requirement of her job. She had joined the team at the invitation of the team's leader—the then Deputy Executive Director of DPA, Gutwillig.

32. At the Criminal Justice Reform team's initial meeting in January of 2016, the team determined that, in order to reach a broader audience, DPA should also engage writers of color, and specifically that DPA should reach out to West Savali, a prominent Black writer employed by The Root who had covered matters of race and drug policy.

33. Based on this decision, on May 3, 2016, Bandele submitted to her then-supervisor, Gutwillig, a budget narrative advocating that DPA set aside $ 20,000 in the annual budget for consultants in order to fund reporting on drug policy issues. This budget narrative specifically listed the writer, West Savali, as a consultant.

34. On May 3, 2016, after reviewing this proposal (and combining it with budget narratives from other departments), Gutwillig submitted the compiled document to Ethan Nadelmann ("Nadelmann"), who was then the Executive Director of DPA, and to Nadelmann's assistant, Christopher Soda ("Soda"). In the e-mail, Gutwillig asked Soda to propose times for scheduling a meeting with Nadelmann, Bandele, and other staff members "to discuss new budget activities."

35. On May 6, 2016, Soda sent an e-mail to Bandele, Gutwillig, and Nadelmann, inviting them to a meeting to discuss the budget. The budget narrative, advocating the setting aside of funds for "popular writers of color [to write] about the intersection of drug, race and criminal justice policy,"[6] was discussed in person at the meeting.

36. On May 22, 2016, Nadelmann approved an annual budget for Fiscal Year 2017 that specifically included hiring the writer, West Savali, as a consultant. The following year, DPA's budget for Fiscal Year 2018 again set aside funds for consultants in the media.

37. In December of 2016, West Savali entered into the initial contract with DPA, after the contract was reviewed, approved and signed by Osmany "Ryan" Chavez, the current CFO of DPA.

38. From December of 2016 through March of 2018, DPA paid West Savali a total of approximately $45,750 pursuant to contracts with the writer. This expenditure had been approved after in-person and written presentations to supervisors and to funders.

39. DPA's partnership with West Savali was announced to staff throughout the organization. For example, on December 28, 2016, a program report compiled by Gutwillig was sent to all staff members, including, but not limited to the then-Executive Director (Nadelmann).

---

[6] Budget Narrative.

This report specifically listed the hiring of West Savali. On October 19, 2017, McFarland was among the staff members sent a progress report that indicated that DPA was funding reporting by West Savali for The Root.

40. West Savali's boss at The Root, Genetta Adams ("Adams"), had also been notified that West Savali would be leading the work with DPA and that DPA, to the extent it could, would pay for expenses not covered by The Root. Adams approved of West Savali partnering with DPA in phone calls with Bandele and West Savali, in emails, and before union representatives, admitted to knowing that there was a financial relationship between DPA and The Root from the beginning.

41. Moreover, DPA's partnership with the Root and West Savali was also disclosed publicly through the multiple "Facebook Lives" produced with her. (Through a "Facebook Live," "people [and] public figures… share live video with their followers and friends on Facebook." Facebook, Frequently Asked Questions, Available at: https://live.fb.com/about/ [Last visited on July 26, 2018]).

42. In addition to the "Facebook Lives," under the contracts with DPA, West Savali wrote nineteen stories, edited three stories, and, in May of 2018, she had three additional stories in progress.

43. In January of 2018, Bandele submitted her work plan for the year ahead to her direct supervisor, Widney Brown ("Brown"). Brown approved the work plan. Subsequently, on January 24, 2018, Soda sent to McFarland an e-mail with Bandele's work plan. Bandele's work plan reviewed the work that had already been produced from the partnership with the consultant and one of the attachments explicitly named West Savali.  These documents were in addition to a narrative Bandele shared with McFarland in the fall of

14

2017 about the first six months of activities undertaken by the project Bandele managed and was able to execute because of the grant from Open Philanthropy. That document detailed multiple outputs by West Savali which all accrued to the funding from Open Philanthropy.

44. On May 17, 2018, Bandele was instructed to attend a meeting at the law offices of DPA's counsel, Michele Coyne ("Coyne") at 1:00 p.m. on May 21, 2018. She was advised that she may have been a witness to a workplace incident. McFarland and Coyne refused to further clarify the purpose of the meeting.

45. On May 19, 2018, at roughly 12:00 noon, Bandele returned from a business trip and attempted to gain access to her office at DPA to pick up work.  She discovered that she had been locked out of the office.

46. On Monday, May 21, 2018, DPA summarily terminated Bandele's employment. At the meeting held that afternoon, with McFarland, Defendant Ferguson, a member of the Board of DPA, and Coyne, Bandele was told that, although the meeting was originally scheduled to discuss another matter, between the evening of May 17th (when McFarland communicated with Bandele about the appointment with Coyne and also about scheduling a discussion sometime in the future about funders Bandele wanted to make management aware of) and 12 Noon on Saturday, May 19th (when Bandele discovered that she had been locked out of the office), the executive team at DPA had uncovered what they characterized as a misuse of funds. Specifically, McFarland and Ferguson claimed that a thorough investigation had been undertaken between the night of May 17th and the afternoon of May 19th and that, in its course, they had found the payments to West Savali to be excessive and a misuse of funds.  Additionally, McFarland and

Ferguson claimed that funding West Savali's journalism, rather than funding the Root directly and without making public the relationship, risked harm to DPA's reputation by subjecting DPA to potential accusations that the organization was responsible for "fake news."

47. Bandele was further informed on May 21, 2018, that the executive committee of the Board of Directors of DPA had been fully informed of the matter, and had convened an emergency meeting over the weekend, at which the committee had affirmed the decision of the executive director, McFarland, to terminate Bandele immediately.

48. At the conclusion of the meeting, at approximately 1:45 p.m. on May 21, 2018, Coyne handed a severance agreement to Bandele's attorney. Ferguson advised Bandele that the terms of the severance agreement included thirteen (13) weeks of salary and health care coverage. Ferguson also advised Bandele that because DPA "cared" about Bandele and her daughter, the organization did not seek to damage her reputation or opportunities for future employment. Further, Ferguson said that the organization did not wish to include the journalist in the instant matter and he advised Bandele to read the proposed severance agreement over with her attorney and accept its terms.

49. Immediately after Bandele's termination, at approximately 1:55 p.m., roughly ten minutes after DPA had offered the proposed severance agreement, McFarland sent a defamatory letter to colleagues outside of the organization—including, but not limited to, leaders at Open Philanthropy and Wellspring Philanthropic Advisors—accusing her of misusing DPA funds and conduct that threatened the integrity of DPA. Bandele was also publicly discredited before the staff by the Board Chair. In contrast, DPA has not sent

letters to persons outside of the organization making accusations about similarly situated non-Black and/or male employees terminated by DPA.

50. Bandele was never given an opportunity to respond to the allegations McFarland and Ferguson raised. The decision to provide funding for West Savali's work had been made by a team led by the then Deputy Executive Director of DPA, advanced through all existing proper channels, had been approved by DPA's highest officials, and had been disclosed throughout DPA in 2016. The meeting on May 21, 2018 was the first time that anyone at DPA had expressed a concern to Bandele that funding West Savali's work was improper. McFarland and Bandele had been scheduled to have a meeting about Bandele's budget on May 31, 2018. At the time of her termination on May 21, 2018 for hiring West Savali, McFarland and Bandele had not had a discussion regarding her budget.

51. The decision to terminate Bandele was made without the benefit of any substantial investigation into the alleged misconduct. Obviously the evidence of prior approval was ignored, as was any substantive input from the parties involved in the previous year's employment of West Savali. In fact, Bandele's termination came as a surprise to many working for and with DPA. Widney Brown ("Brown"), who was Bandele's direct supervisor at the time of termination, was apparently unaware that she was going to be fired as evidenced in e-mail correspondence. On May 18, 2018, Brown wrote an e-mail to Bandele discussing their upcoming meeting scheduled for May 24, 2018 (the Thursday after Bandele was terminated). On May 21, 2018, half an hour before the meeting at which Bandele was terminated, Brown sent an e-mail indicating she did not understand why Bandele had been locked out of the office and inquired about whether or not it had been resolved. When Bandele contacted DPA's Human Resources Director to inquire

about the exit process, the Human Resources Director advised that she had not been

aware that Bandele was going to be terminated.

52. Bandele was locked out of the office before anyone had advised her that she was

suspected of any wrongdoing and the staff was advised that she was barred from all

offices. Further, although Bandele had known some of the staff members for as long as

thirteen years and had friendships with staff members, Bandele was told that she could

not call anyone on staff without having first secured written permission—something that

was not done to non-black and/or male employees, even where monies were alleged to

have been misappropriated.

53. In instances where non-black and/or male employees have been accused of egregious

misconduct, malfeasance or bad performance, they have all been offered due process,

have undergone lengthy investigatory processes or were given an opportunity to

rehabilitate their performance evaluations.

54. Candida Ventimiglia is a white woman who was accused in November or December of

2015 of using DPA funds to pay for personal expenses. She was subsequently

investigated over a period of roughly three months and given an opportunity to respond to

the allegations. After a period of months, Ms. Ventimiglia was terminated in February of

2016.  Moreover, whereas in Bandele's case the staff was instructed that she was not

allowed to contact anyone without prior written permission, deep sadness was expressed

in the email from the CFO announcing Ventimiglia's departure.

55. In 2017, Dan Abrahamson, a white male who had been warned for years that he under-

performed and was not on task, was demoted and then terminated after a review period of

more than a year.  Abrahamson was allowed to tender a letter of resignation in his own

voice to the staff and provided a period of at least one week to manage his affairs in a way that was respectful.

56. Another white male, Derek Rosenfeld, was terminated on July 13, 2018, after policy staff had complained about his work over a period of years. In July of 2018, he was informed that his position was being eliminated.  Unlike Bandele, Rosenfeld was not locked out of the office before being informed of his termination, nor was he disallowed from collecting his personal effects himself, nor warned that he could not contact staff without written permission.  Nor was the staff so warned about him, as they were in the case of Bandele.

57. In 2015, Daniel Robelo a white male of Latino descent who also was alleged to have under-performed was given months, perhaps as long as a year, to rehabilitate before he was terminated. Another male employee, Rafael D'Arce, had been accused of misappropriating funds. DPA gave him an opportunity to rehabilitate before terminating his employment after the behavior continued. All of this happened, as in Bandele's case, under the watch of the current CFO, who also oversees the organization's area of human resources.

58. Most recently, under McFarland's direct tenure, and aside from the Rosenfeld matter, there are two other instructive examples of male employees whose treatment has been wholly different than Bandele's. Judh Grandchamps ("Grandchamps"), who reported to the development team, was an employee who was significantly underperforming. According to McFarland and also Grandchamps' direct supervisors, he had put DPA's reputation at risk by neglecting to thank donors for a period of months. Further, Grandchamps had misplaced a significant check that had been donated to DPA for a

period of time. After being made aware of the issues—ones that ostensibly exposed the organization to reputational harm amongst its donors—McFarland's response was to ask Bandele to bring Mr. Grandchamps onto her team, create a position for him and attempt to get him to perform at organizational standard. Bandele complied.  In other words, Grandchamps was given an opportunity to address the issues and rehabilitate himself within DPA.

59. Most recently, McFarland was informed by at least May 17th of this year that Armando Guidino, an Hispanic male who was the subject of a previous complaint of gender-based discrimination, had sexually and inappropriately touched a junior Black woman staff member. The staff member subsequently resigned.  As of the date of this Complaint, Guidino continues to be in DPA's employ.

60. All of these examples of gross and egregious conduct were met with considered investigation and consideration, and in instances of termination, the organization did not seek to further harm the staff member. However, Bandele's DPA-sanctioned and approved conduct of hiring a Black writer who successfully executed the work she was contracted to do with the full knowledge and consent of the organization—which has had a years-long history of financially supporting reporting from white media outlets (such as Alternet) on issues of drug policy without those outlets having to do so as sponsored material and without concern to reputational harm—was used as a tool to not only summarily terminate Bandele's employment, but also to defame and publicly humiliate her in the process.

61. Similarly situated non-black and/ or male DPA employees have approved both the financial support of white writers (such as Phil Smith) and organizations to advance the

20

issue of drug policy reform in America. They were not terminated or even penalized. Additionally, Chavez, the CFO of DPA, who approves and reviews all contracts (and specifically reviewed and approved the subject contract with West Savali) was not terminated or otherwise penalized.

62. As a result of Defendants' actions, Plaintiff suffered loss of employment, extreme emotional distress, mental anguish and anxiety from which she still suffers.

63. On May 22, 2018, Plaintiff filed a formal complaint with the EEOC against Defendant DPA, alleging that Defendant violated her rights under Title VII of the Civil Rights Act of 1964 for discrimination, creating a hostile work environment and retaliation.

64. On August 28, 2018, the EEOC issued a Right-to-Sue Letter (Attached hereto as Exhibit A) in this matter.

65. This action was timely commenced within the ninety (90) day statutory period in which a Plaintiff in possession of a Right-to-Sue letter may bring an action.

## FIRST CLAIM FOR RELIEF

## BANDELE AGAINST DPA

## DISCRIMINATION BASED ON RACE IN VIOLATION OF

## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. §§ 2000e et seq.)

66. Bandele repeats and re-alleges paragraphs 1 - 65 of this Complaint as if set forth herein.

67. Bandele was at all times DPA's employee as the term is defined under Title VII of the Civil Rights Act of 1964 ("Title VII"). DPA was at all times an employer as that term is defined under Title VII.

68. Bandele is a member of a protected class as Title VII protects individuals from employment discrimination based upon race and Bandele is an African American.

69. Plaintiff, an African American woman, was discriminated against in violation of Title VII. She and the members of her team, all of whom were persons of color, were excluded from a presentation at DPA about their work—a meeting that similarly situated white employees were invited to attend and participate in. Despite thirteen years of exemplary work, a junior white staff member was sent to direct her on a project that she was spearheading with the approval of her superiors—a project that was unjustifiably stalled. Despite DPA having publicly challenged racism through, *inter alia,* social media, Bandele was reprimanded for criticizing white supremacy on her own social media accounts and directed to delete her posts.

70. Plaintiff was terminated despite the fact that similarly situated employees of other races who were involved in the conduct that she was terminated over were not similarly penalized.

71. Unlike Plaintiff, similarly situated employees of other races who faced accusations of wrongdoing or of underperformance were given an opportunity to respond to the allegations against them or to correct their behavior.

72. Further, none of the white employees that have been terminated by DPA were treated in the manner Plaintiff was treated, i.e. they were not locked out of DPA's offices prior to being advised of their termination, they were not told that they required advance written permission to contact friends and colleagues that they had worked alongside with for years, and DPA did not contact third parties to make accusations about their wrongdoing.

73. By the actions described above, DPA has discriminated against Plaintiff on the basis of her race. DPA knew its actions constituted unlawful discrimination or showed reckless disregard for Plaintiff's statutorily protected rights.

74. Bandele suffered irreparable injury, economic harm, and monetary damage from DPA's discriminatory conduct and will continue to do so unless and until the Court grants relief. As a direct and proximate result of DPA's unlawful discriminatory conduct, Bandele has suffered physical and emotional symptoms and continues to suffer severe mental anguish and emotional distress including but not limited to humiliation, embarrassment, stress and anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## SECOND CLAIM FOR RELIEF

## BANDELE AGAINST ALL DEFENDANTS

## DISCRIMINATION BASED ON RACE IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

## N.Y. EXEC. LAW §§ 290 et seq.

75. Bandele repeats and re-alleges paragraphs 1 - 74 of this Complaint as if set forth herein.

76. Bandele was at all times DPA's employee and DPA was at all times Bandele's employer as these terms are defined under the New York State Human Rights Law ("NYSHRL").

77. Maria McFarland is a proper individual defendant under the NYSHRL because she directly participated in the discriminatory conduct against Plaintiff and exercised managerial authority on behalf of DPA as an executive of the organization.

78. James Ferguson is a proper individual defendant under the NYSHRL because he directly participated in discriminatory conduct against Plaintiff and he exercised managerial authority on behalf of DPA as a member of the Board of Directors of the organization.

79. Bandele is a member of a protected class as the NYSHRL prohibits discrimination on the basis of race and Plaintiff is an African American woman.

80. DPA, Maria McFarland and James Ferguson, through the actions of McFarland and Ferguson, discriminated against Bandele based upon her race. Bandele's work was undermined and her leadership called into question in a manner that employees of other races did not face. Non-Black employees who had participated in and approved the action for which she was terminated were never penalized. Unlike Plaintiff, non-Black employees who have been suspected of wrongdoing have been given a chance to respond to the allegations or to reform. Non-Black employees who have been terminated were not locked out of their place of employment before they were advised of the termination, nor have they been warned they cannot contact any colleagues or friends on the staff without prior written permission. Further, non-Black employees have not been humiliated or had their reputations harmed as the Defendants did to the Plaintiff when McFarland unjustifiably told third parties that Bandele was being terminated for misusing funds or exposing the organization to reputational harm for work that the organization not only approved and sanctioned, but had engaged in even before Bandele's employment with the organization.

81. Defendants' actions were willful. Defendants acted with malice and or reckless indifference to Bandele's statutorily protected rights.

82. Bandele suffered irreparable injury, economic harm, and monetary damage from the Defendants' discriminatory conduct and will continue to do so unless and until the Court grants relief. As a direct and proximate result of the Defendants' unlawful discriminatory conduct, Bandele has suffered physical and emotional symptoms and continues to suffer severe mental anguish and emotional distress including but not limited to humiliation,

24

embarrassment, stress and anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## THIRD CLAIM FOR RELIEF

## BANDELE AGAINST ALL DEFENDANTS

## DISCRIMINATION BASED ON SEX IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

## N.Y. EXEC. LAW §§ 290 et seq.

83. Bandele repeats and re-alleges paragraphs 1 – 82 of this Complaint as if set forth herein.

84. Bandele was at all times DPA's employee and DPA was at all times Bandele's employer as these terms are defined under the New York State Human Rights Law ("NYSHRL").

85. Maria McFarland is a proper individual defendant under the NYSHRL because she directly participated in the discriminatory conduct against Plaintiff and exercised managerial authority on behalf of DPA as an executive of the organization.

86. James Ferguson is a proper individual defendant under the NYSHRL because he directly participated in discriminatory conduct against Plaintiff and he exercised managerial authority on behalf of DPA as a member of the Board of Directors of the organization.

87. Bandele is a member of a protected class as the NYSHRL prohibits discrimination on the basis of sex and Plaintiff is a woman.

88. DPA, McFarland, and Ferguson, through the actions of McFarland and Ferguson, discriminated against Bandele based upon her sex. Bandele's work was undermined and her leadership called into question in a manner that male employees did not face. Male employees who had participated in and approved the action for which she was terminated were never penalized.

89. Unlike Plaintiff, male employees who have been suspected of wrongdoing have been given a chance to respond to the allegations or to reform. Male employees who have been terminated were not locked out of their place of employment before they were advised of the termination, nor have they been warned they cannot contact any colleagues or friends on the staff without prior written permission. Further, male employees have not been humiliated or had their reputations harmed as the Defendants did to the Plaintiff when McFarland unjustifiably told third parties that Bandele was being terminated for misusing funds.

90. The Defendants' actions were willful. The Defendants acted with malice and or reckless indifference to Bandele's statutorily protected rights.

91. Bandele suffered irreparable injury, economic harm, and monetary damage from the Defendants' discriminatory conduct and will continue to do so unless and until the Court grants relief. As a direct and proximate result of the Defendants' unlawful discriminatory conduct, Bandele has suffered physical and emotional symptoms and continues to suffer severe mental anguish and emotional distress including but not limited to humiliation, embarrassment, stress and anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

**FOURTH CLAIM FOR RELIEF**

**BANDELE AGAINST DPA**

**DISCRIMINATION BASED ON SEX IN VIOLATION OF**

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. §§ 2000e et seq.)**

92. Bandele repeats and re-alleges paragraphs 1 - 91 of this Complaint as if set forth herein.

93. Bandele was at all times DPA's employee as the term is defined under Title VII. DPA was at all times an employer as that term is defined under Title VII.

94. Bandele is a member of a protected class as Title VII protects individuals from employment discrimination based upon sex and Bandele was a female employee.

95. Title VII protects individuals from employment discrimination based upon sex.

96. Plaintiff, a woman, was discriminated against in violation of Title VII.

97. Plaintiff was terminated despite the fact that similarly situated male employees who were involved in the conduct that she was terminated over were never penalized.

98. Unlike Plaintiff, similarly situated male employees who faced accusations of wrongdoing or of underperforming were given an opportunity to respond to the allegations against them or to correct their behavior.

99. Further, none of the male employees that have been terminated by DPA were treated in the manner Plaintiff was treated, i.e. they were not locked out of DPA's offices prior to being advised of their termination, they were not told that they required advance written permission to contact friends and colleagues that they had worked alongside with for years, and DPA did not contact third parties to make accusations about their wrongdoing.

100.      By the actions described above, DPA has discriminated against Plaintiff on the basis of her sex. DPA knew its actions constituted unlawful discrimination or showed reckless disregard for Plaintiff's statutorily protected rights.

101.      Bandele suffered irreparable injury, economic harm, and monetary damage from DPA's discriminatory conduct and will continue to do so unless and until the Court grants relief. As a direct and proximate result of DPA's unlawful discriminatory conduct, Bandele has suffered physical and emotional symptoms and continues to suffer severe

mental anguish and emotional distress including but not limited to humiliation, embarrassment, stress and anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

### FIFTH CLAIM FOR RELIEF

### BANDELE AGAINST ALL DEFENDANTS

### DISCRIMINATION BASED ON GENDER IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW

### N.Y.C. ADMINISTRATIVE CODE  §§ 8 -101 et seq

102.     Bandele repeats and re-alleges paragraphs 1 - 101 of this Complaint as if set forth herein.

103.     Bandele was at all times DPA's employee and DPA was at all times Bandele's employer as these terms are defined under the New York City Human Rights Law ("NYCHRL").

104.     McFarland is a proper individual defendant under the NYCHRL because she is an employee of DPA and because she directly participated in the discriminatory conduct against Bandele, and exercised managerial authority on behalf of DPA as the Executive Director of DPA.

105.     Ferguson is a proper individual defendant under the NYCHRL because he directly participated in discriminatory conduct against Plaintiff and he exercised managerial authority on behalf of DPA as a member of the Board of Directors of the organization.

106.     Bandele is a member of a protected class as the NYCHRL prohibits discrimination on the basis of gender and Plaintiff is a woman.

107.     DPA, McFarland and Ferguson discriminated against Bandele based upon her
gender. Her work was undermined and her leadership called into question in a manner
that male employees did not face. Male employees who had participated in and approved
the action for which she was terminated were never penalized.

108.     Unlike Plaintiff, male employees who have been suspected of wrongdoing have
been given a chance to respond to the allegations or to reform. Male employees who have
been terminated were not locked out of their place of employment the day they were
advised of the termination, nor have they been warned they cannot contact any colleagues
or friends on the staff without prior written permission. Further, male employees have not
been humiliated or had their reputations harmed as DPA and McFarland did to the
Plaintiff when McFarland unjustifiably told third parties that Bandele was being
terminated for misusing funds.

109.     The Defendants' actions were willful. The Defendants acted with malice and or
reckless indifference to Bandele's statutorily protected rights.

110.     Bandele suffered irreparable injury, economic harm, and monetary damage from
the Defendants' discriminatory conduct and will continue to do so unless and until the
Court grants relief. As a direct and proximate result of the Defendants' unlawful
discriminatory conduct, Bandele has suffered physical and emotional symptoms and
continues to suffer severe mental anguish and emotional distress including but not limited
to humiliation, embarrassment, stress and anxiety, and emotional pain and suffering for
which she is entitled to an award of monetary damages and other relief.

## SIXTH CLAIM FOR RELIEF

## BANDELE AGAINST ALL DEFENDANTS

## DISCRIMINATION BASED ON RACE IN VIOLATION OF THE NEW YORK CITY

## HUMAN RIGHTS LAW

## N.Y.C. ADMINISTRATIVE CODE  §§ 8 -101 et seq

111.     Bandele repeats and re-alleges paragraphs 1 - 110 of this Complaint as if set forth

herein.

112.     Bandele was at all times DPA's employee and DPA was at all times Bandele's

employer as these terms are defined under the New York City Human Rights Law

("NYCHRL").

113.     McFarland is a proper individual defendant under the NYCHRL because she is an

employee of DPA and because she directly participated in the discriminatory conduct

against Bandele, and exercised managerial authority on behalf of DPA as the Executive

Director of DPA.

114.     Ferguson is a proper individual defendant under the NYCHRL because he directly

participated in discriminatory conduct against Plaintiff and he exercised managerial

authority on behalf of DPA as a member of the Board of Directors of the organization.

115.     Bandele is a member of a protected class as the NYCHRL prohibits

discrimination on the basis of race and Plaintiff is an African American woman.

116.     DPA, McFarland, and Ferguson discriminated against Bandele based upon her

race. Her work was undermined and her leadership called into question in a manner that

employees of other races did not face. Non-Black employees who had participated in and

approved the action for which she was terminated were never penalized. Unlike Plaintiff,

non-Black employees who have been suspected of wrongdoing have been given a chance to respond to the allegations or to reform. Non-Black employees who have been terminated were not locked out of their place of employment prior to the day they were advised of the termination, nor have they been warned they cannot contact any colleagues or friends on the staff without prior written permission. Further, non-Black employees have not been humiliated or had their reputations harmed as DPA and McFarland did to the Plaintiff when McFarland unjustifiably told third parties that Bandele was being terminated for misusing funds.

117.    The Defendants' actions were willful. The Defendants acted with malice and or reckless indifference to Bandele's statutorily protected rights.

118. Bandele suffered irreparable injury, economic harm, and monetary damage from the Defendants' discriminatory conduct and will continue to do so unless and until the Court grants relief. As a direct and proximate result of the Defendants' unlawful discriminatory conduct, Bandele has suffered physical and emotional symptoms and continues to suffer severe mental anguish and emotional distress including but not limited to humiliation, embarrassment, stress and anxiety, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## **DEMAND FOR TRIAL BY JURY**

119.  Bandele hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Bandele prays for relief as follows:

a) That the jury find and the Court adjudge and decree that Plantiff Bandele shall recover compensatory, emotional, and punitive damages in an amount to be determined at trial against Defendants, together with interests and costs;

b) Awarding Bandele backpay calculated from the date of termination to the present;

c) Awarding Bandele any and all available statutory remedies, both legal and equitable;

d) Awarding Bandele such interest as is allowed by law;

e) Awarding Bandele her reasonable attorneys' fees and costs and

f) Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       September 4, 2018


Respectfully submitted,


| _____/s/_____ | _____/s/_____ |
| Rubinstein & Corozzo, LLP | The Law Office of Keith White, PLLC |
| By:     Joseph R. Corozzo | By: Keith White |
|         Angela D. Lipsman | 198A Rogers Ave. |
| 260 Madison Ave., 22d Fl. | Brooklyn, New York 11225 |
| New York, New York 10016 | (718) 403-9261 |
| Ph: (212) 545-8777 | keith@keithwhitelaw.com |
| Fax: (917) 722-8206 | |
| Email: jcorozzo@rubcorlaw.com | |