UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------

CAROL A. BULLARD, *also known as* ASHA
BANDELE,

                                Plaintiff,

                -v.-                                                    18 Civ. 8081 (KPF)

DRUG POLICY ALLIANCE, MARIA
McFARLAND, and JAMES FERGUSON,                          **OPINION AND ORDER**

                                Defendants.

----------------------------------------------------------

DRUG POLICY ALLIANCE,

                                Counter-Claimant,

                -v.-

CAROL A. BULLARD, *also known as* ASHA
BANDELE,

                                Counter-Defendant.

----------------------------------------------------------

KATHERINE POLK FAILLA, District Judge:

        Plaintiff Carol Bullard, also known as Asha Bandele ("Bandele"), brought

the instant action against her former employer, the Drug Policy Alliance

("DPA"), and several of its employees, alleging claims of race and sex

discrimination in violation of federal, state, and local law.  DPA then filed

counterclaims against Bandele for breach of fiduciary duty and fraud, alleging

that she misappropriated DPA's funds by arranging for DPA to enter into a

series of contracts with a personal friend, Kirsten West Savali ("West Savali"),

to provide press coverage about DPA.  DPA claims that Bandele actively

concealed the true nature of the contracts from DPA, and that DPA would not

have entered into the transactions if it had known that Bandele was paying West Savali personally, rather than through West Savali's employer. Bandele has moved to dismiss DPA's counterclaims for failure to state a claim, and alternatively asks the Court to decline to exercise supplemental jurisdiction over these state-law counterclaims. For the reasons explained below, Bandele's motion to dismiss is denied in full.

## BACKGROUND[1]

### A.     Factual Background

DPA is a non-profit organization and a leading advocate for drug policy reform. (Countercl. ¶ 148). Bandele became affiliated with DPA in 2006 and joined as an employee on January 1, 2009. (*Id.* at ¶ 20; Answer ¶ 2). As of 2015, Bandele held the title of Senior Director of Grants, Partnerships, and Special Projects. (Countercl. ¶ 166; Answer ¶ 2). As a Senior Director, Bandele reported to Widney Brown, who became the Managing Director for Policy in October 2017. (Countercl. ¶¶ 167, 173). In turn, Brown reported to DPA's Executive Director, Maria McFarland. (*Id.* at ¶¶ 167, 170).

DPA operates on donations and, consequently, structures its budget to focus on expenses that aid its mission. (Countercl. ¶ 234). DPA typically receives journalistic coverage for free; it does not pay news organizations or

---

[1]     The facts contained in this Opinion are drawn principally from DPA's Answer and Counterclaims ("Countercl."). (Dkt. #23). References in this Opinion to "Defendant" pertain to DPA, the only defendant to bring counterclaims in this action.

For ease of reference, the Court refers to the parties' briefing as follows: Plaintiff Bandele's opening brief as "Pl. Br." (Dkt. #33); Defendant DPA's opposition brief as "Def. Opp." (Dkt. #35); and Plaintiff Bandele's reply brief as "Pl. Reply" (Dkt. #37).

journalists on staff at other news organizations directly for coverage of DPA, except in the form of "sponsored content" that is clearly labeled as such. (*Id.* at ¶¶ 223-24). DPA's viability as a successful non-profit organization depends on its reputation of credibility and fair-dealing. (*Id.* at ¶ 238). In 2016, DPA engaged in a journalistic partnership with The Root, an online magazine with a focus on African-American news and culture. (*Id.* at ¶¶ 225, 151). The partnership consisted only of working together on stories and cross-publishing material. (*Id.* at ¶ 225). It did not include any exchange of funds. (*Id.*).

In March 2017, DPA received a significant grant from a funder. (Countercl. ¶ 174). Bandele was tasked with supervising much of the work under this grant. (*Id.*). Between 2016 and 2018, Bandele entered into four contracts on behalf of DPA with West Savali, a journalist for The Root and a personal friend. (*Id.* at ¶¶ 151, 152, 154, 175). Each of the contracts indicated that West Savali would be paid for content that supported DPA's mission and would be published in The Root. (*Id.* at ¶ 176).[2] Of potential note, the contracts were each addressed to West Savali's home address and personal email account. (*Id.* at ¶ 178). All of the payments for the contract were made to West Savali personally, and not to The Root or any other journalistic entity. (*Id.* at ¶ 179).

---

[2]     Several of the contracts provided that West Savali would engage in live Facebook chats coordinated by Bandele and The Root. (Countercl. ¶ 177). Additionally, several of the contracts provided that West Savali's content would be cross-posted to DPA's website after appearing in The Root. (*Id.*).

Specifically, on December 1, 2016, West Savali entered into a contract with DPA according to which West Savali would be paid $5,000 to report four articles designed to engage African American and Southern communities about the drug war to be featured in The Root or other publications. (Countercl. ¶ 181). On April 1, 2017, West Savali entered into another contract with DPA according to which West Savali would be paid $15,000 for seven articles addressing the impact of the drug war on the American South to be featured in The Root. (*Id.* at ¶ 182). On November 3, 2017, West Savali entered into a third contract with DPA according to which West Savali would receive $15,000 to write five articles about the drug war in connection with Black History Month in The Root. (*Id.* at ¶ 183). And on March 14, 2018, West Savali entered into a fourth contract with DPA according to which West Savali would be paid $10,000 for coverage of a DPA delegation to Portugal for The Root. (*Id.* at ¶ 184).

As a director-level employee, Bandele was responsible for the content of the contracts. (Countercl. ¶ 192). Bandele did not obtain substantive review of the contracts from either her supervising Managing Director or the Executive Director. (*Id.* at ¶ 194). Rather, she actively concealed the contracts from her direct supervisors because she knew that her supervisors would not approve them. (*Id.* at ¶ 195).

Bandele endeavored to comply with the letter, but not the spirit, of DPA policy, which requires that all contracts be signed by either the Executive Director or the Managing Director of Finance, Ryan Chavez. (Countercl. ¶ 191).

Bandele presented the contracts to Chavez, who is an accountant, for his signature. (*Id.* at ¶ 193). While Chavez reviewed and approved the procedural and accounting aspects of the contracts, he was not qualified (as Bandele well knew) to challenge the substance of the contracts. (*Id.* at ¶¶ 193, 195).

In order to obtain his signature, Bandele led Chavez to believe that the contracts were negotiated in the normal course and would have been approved by Bandele's supervisors if they had been shown to those individuals. (Countercl. ¶ 196). She repeatedly told Chavez that the contracts needed to be signed with urgency, so as not to permit Chavez time to consult with other senior DPA management. (*Id.* at ¶ 197). For example, on March 14, 2018, at 4:00 p.m., Bandele emailed Chavez with high importance, with the subject-line "RYAN — Can you sign this pleeeeease???????," attaching the contract with West Savali for the Portugal trip. (*Id.* at ¶ 200). Bandele stated that she "neglected to move Kirsten's contract for Portugal. Would you mind signing this so that we can provide her funds to her via PayPal tomorrow? Thank you so much!!!!!!!!!" (*Id.*). Chavez responded to Bandele indicating that he was out of the office and suggested that Bandele have the contract reviewed and signed by McFarland to expedite the matter. (*Id.* at ¶ 204). Despite the professed urgency, Bandele declined to present the contract to McFarland and told Chavez she preferred to wait for him to sign the contract when he returned to the office. (*Id.* at ¶ 205).

On March 14, 2018, DPA's Policy Team revised its internal procedures to require all contracts to be reviewed substantively by a supervising Managing

Director or the Executive Director. (Countercl. ¶ 199). Around this time, Brown expressed concern to Bandele that she was not receiving all of Bandele's expenses or contracts for approval. (*Id*. at ¶ 199). On March 14, 2018, at 5:14 p.m., Brown followed up on her earlier conversation with Bandele and sent a direct message to all of her direct reports, including Bandele, indicating that going forward she would need to review all contracts before they were executed. (*Id*. at ¶ 201). At 5:21 p.m. the same day, Bandele wrote to Brown, forwarding her note to Chavez asking him to sign the contract and stating, "Just saw your email. This is an outgoing contract via [the funder]." (*Id*. at ¶ 202). Due to the upcoming Portugal delegation, Brown did not have an opportunity to approve the contract or respond to Bandele until Brown returned from Portugal. (*Id*. at ¶ 203).

Soon after the Portugal trip, Brown asked Chavez for all of Bandele's contracts so that Brown could review them. (Countercl. ¶ 206). After reviewing the contracts, Brown expressed concern about them to McFarland. (*Id*. at ¶ 207). It was around this time that McFarland first learned about the series of DPA contracts with West Savali. (*Id*.). On April 17, 2018, a DPA employee also brought the contracts to McFarland's attention and informed her that The Root may not have been aware that West Savali was receiving direct payments from DPA. (*Id*. at ¶ 208). This employee also told McFarland that Bandele had arranged the Portugal contract for West Savali because West Savali was "going through a rough time." (*Id*. at ¶ 209). At the time, West Savali's husband had lung cancer and West Savali had been affected by Hurricane Harvey. (*Id*.).

McFarland also learned from this employee how Bandele determined the amount of the $10,000 contract for the Portugal delegation: $5,000 for West Savali to fly first class to Portugal and $5,000 for West Savali to put a down payment on a car.  (*Id.* at ¶ 210).

On April 28, 2018, McFarland contacted an expert in journalistic ethics. (Countercl. ¶ 211).  The expert advised McFarland that the arrangement between Bandele and West Savali was a serious breach of journalistic ethics and that no legitimate journalist would engage in this conduct, which appeared to constitute double-dipping.  (*Id.*).  The expert also indicated that, for DPA, this was a big reputational issue.  (*Id.*).  Finally, the expert said that even if the payments had been ethical, the rates being paid for this work were heavily inflated and that the standard rate for articles of this type is in the hundreds of dollars — not the thousands of dollars.  (*Id.*).  The expert recommended that DPA find out what The Root knew.  (*Id.*).

On May 4, 2018, McFarland spoke to an attorney for Univision, the parent company for The Root.  (Countercl. ¶ 212).  The attorney confirmed that West Savali was a staff writer and could not receive separate payments for her work in The Root.  (*Id.*).  The attorney also indicated that The Root was not aware of any written agreement or exchange of money between DPA and West Savali, and that it would be highly problematic for West Savali to be receiving payments in a personal capacity from DPA.  (*Id.*).  In a follow-up conversation with an attorney for The Root, the attorney clarified that staff writers for The Root are not allowed to receive payments from others for their work in The

Root, and that any such payments would need to be approved by The Root. (*Id.* at ¶ 213). The attorney noted that for situations in which groups like DPA wanted to pay for content on The Root's website, they would have to pay for "sponsored content" that is clearly labeled as such and goes through an entirely different process — not through the journalists. (*Id.*).

On May 16, 2018, McFarland spoke with the Executive Committee of the DPA Board. (Countercl. ¶ 214). She briefed the Committee on the investigation and told them that she was planning to terminate Bandele's employment on the basis of the improper contracts and payments to West Savali. (*Id.*).[3] The Executive Committee expressed deep concern and approved Bandele's termination. (*Id.* at ¶ 215). The Committee further indicated that the termination should be completed quickly so that it did not appear that DPA was complicit in Bandele's actions. (*Id.*). On May 21, 2018, Bandele's employment was terminated. (*Id.* at ¶ 216).

On June 5, 2018, DPA shared with The Root details of the investigation into Bandele's conduct. (Countercl. ¶ 219). The Root indicated that they had

---

[3] During the course of DPA's investigation into the contracts, DPA uncovered other instances in which Bandele appeared to have misused DPA funds. (Countercl. ¶ 217). For example, in June 2017, Bandele used DPA's corporate credit card to pay for an approximately $1,200 first-class one-way ticket from California to New York for a consultant and disguised it as a round-trip coach ticket. (*Id.*). Bandele separately submitted an expense reimbursement request for a $600 one-way ticket for the same consultant for the same trip. (*Id.*). Bandele concealed that she was reimbursing the consultant for a first-class ticket by dividing up the expenses in order to circumvent DPA's policy prohibiting first class travel. (*Id.*). In addition, in January 2017, Bandele submitted an invoice for reimbursement for a dinner with a leader in a partner organization and drinks with a now-current DPA staff member who was not employed by DPA at the time. (*Id.* at ¶ 218). During its investigation, DPA learned that the now-current DPA staff member did not meet Bandele on the date in question and had never had drinks with Bandele. (*Id.*).

not been aware of the contracts and payments to West Savali. (*Id.*). One week later, on June 12, 2018, The Root announced on its website that it had "separated from [its] associate editor, Kirsten West Savali, because of an editorial standards issue." (*Id.* at ¶ 220). The posting indicated that "[a]fter the Drug Policy Alliance discovered and brought to our attention a previously undisclosed and improper arrangement, Gizmodo Media Group [owner of The Root] conducted a thorough investigation and made the difficult decision to terminate her." (*Id.*). The posting also noted that The Root "will be removing any stories related to Drug Policy Alliance written by and/or edited by Kirsten and replacing each with an editor's note and a linked to a cached version of the story." (*Id.* at ¶ 221). DPA subsequently removed all of West Savali's content that had been cross-posted on DPA's website. (*Id.* at ¶ 222).

## B.    Procedural Background

On September 5, 2018, Bandele initiated the instant action against DPA, McFarland, and DPA board member James Ferguson by filing a complaint in this Court. (Dkt. #1). Her complaint alleges that she was wrongfully terminated by DPA on the basis of both her race and sex, in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §§ 2000e to 2000e-17; the New York State Human Rights Law, N.Y. Exec. Law §§ 290-297; and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-107 to 8-131. (*Id.*). The complaint alleges that other white and/or male DPA employees were not terminated for similar conduct, or that those employees were treated in a more favorable manner during the course of their terminations. (*See id.*).

On the same day that she filed the instant action, Bandele also commenced an action in Kings County Supreme Court for defamation and intentional infliction of emotional distress. *See Bullard* v. *Drug Policy Alliance*, Index No. 518007/2018, Dkt. #1 (Sup. Ct. Kings Cty., Sept. 5, 2018). In that state action, Bandele alleges that McFarland circulated a false and defamatory email to DPA donors following Bandele's termination. (*See id.*).

On October 23, 2018, DPA filed both an answer to Bandele's complaint and counterclaims against Bandele in the instant action for breach of fiduciary duty, fraud, and conversion. (Dkt. #23).[4] On November 13, 2018, Bandele filed a letter noting her intent to move to dismiss the counterclaims against her. (Dkt. #25). The Court held a conference on February 1, 2019. (Dkt. #31 (transcript)). On March 4, 2019, Bandele filed a motion to dismiss the counterclaims on the grounds that they fail to state a claim and that the Court should decline to exercise supplemental jurisdiction over the counterclaims. (Dkt. #33). On April 3, 2019, DPA voluntarily dismissed its conversion counterclaim and filed a brief opposing the dismissal of its breach of fiduciary duty and fraud counterclaims. (Dkt. #34, 35, 36). Bandele filed a reply brief on April 17, 2019. (Dkt. #37). Accordingly, the instant motion is ripe for the Court's review.

---

[4]        The counterclaim for conversion was subsequently withdrawn. (Dkt. #34).

**DISCUSSION**

**A.     Motions to Dismiss Under Rule 12(b)(6)**

A court evaluates a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) using the same standard as a motion to dismiss a complaint. *A.V.E.L.A., Inc.* v. *Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 203 (S.D.N.Y. 2015) (internal citations omitted). When evaluating a motion to dismiss counterclaims for failure to state a claim, a court "must accept all well-pleaded facts as true and construe the answer and counterclaims in the light most favorable to the nonmoving party." *Meridien Int'l Bank Ltd.* v. *Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 445 (S.D.N.Y. 1998); *see Gant* v. *Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995).

A counterclaim defendant prevails on a motion to dismiss if the counterclaim "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). And while a court should accept the counterclaim-plaintiff's allegations as true, it need not follow that course for any of counterclaim-plaintiff's legal conclusions. *See id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Nor must a court "accept as truth conflicting pleadings ... that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec.*

*Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).  In sum, "[a] motion to dismiss should be granted 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'"  *Nielsen* v. *AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679).

## B.    Analysis

### 1.    DPA Has Stated a Claim for Fraud

"In an action to recover damages for fraud, the plaintiff must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury[.]"  *Lama Holding Co.* v. *Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996); *see also Vermeer Owners, Inc.* v. *Guterman*, 78 N.Y.2d 1114, 1116 (1991) (the elements of fraud are "a representation of material fact, falsity, scienter, reliance and injury"); *Gordon & Co.* v. *Ross*, 84 F.3d 542, 546 (2d Cir. 1996) (In New York, "[t]he proper test of reliance in a fraud case is not 'reasonable' reliance, it is 'justifiable' reliance, a clearly less burdensome test.").  The concealment of conflicts of interest or bias, and of undisclosed fees, are sufficient to constitute a material misrepresentation or omission to support a claim for fraud.  *See Syncora Guar. Inc.* v. *Alinda Capital Partners LLC*, No. 651258/2012, 2013 WL 3477133, at *9-10 (N.Y. Sup. Ct. N.Y. Cty. July 1, 2013) (citing cases).  An employee may commit a fraud by diverting or steering contracts on the basis of undisclosed personal friendship or other personal interest.  *See, e.g., Rose* v. *Simms*, No. 95 Civ. 1466 (LMM), 1995 WL 702307,

at *10-11 (S.D.N.Y. Nov. 29, 1995); *Twenty First Century L.P.I.* v. *LaBianca*, 19 F. Supp. 2d 35, 39-40 (E.D.N.Y. 1998) (concluding defendant-employee was liable for common law fraud where he steered contracting work to a construction company from which he received kickbacks).

In support of its claim for fraud, DPA alleges that Bandele intentionally led DPA and her supervisors to believe that she was engaged in legitimate transactions connected to DPA's business purpose, when in reality, she was paying a staff journalist from The Root under the table, without The Root's knowledge, and for personal reasons unrelated to any benefit to DPA. (Countercl. ¶¶ 247-48). DPA claims that Bandele omitted key material facts from DPA and was purposefully deceptive about the true nature of the contracts, precisely because she knew that if their true nature was revealed, the contracts and payments to West Savali would not have been approved. (*See id.* at ¶¶ 249-50).

Bandele, for her part, argues that DPA has not stated a claim for fraudulent concealment because the omissions DPA identifies were either immaterial or could not have been reasonably relied upon by DPA. (*See* Pl. Br. 15). Bandele categorizes the omissions DPA alleges as follows: (i) the existence of her friendship with West Savali; (ii) The Root's lack of knowledge that DPA was paying West Savali; and (iii) the "nature" of the contracts, i.e., that DPA was paying a journalist for coverage. (*See id.* at 15-17). For ease of analysis, the Court adopts Bandele's taxonomy of misrepresentations.

*First*, Bandele claims that the mere existence of her friendship with West Savali is not a material fact. (*See* Pl. Br. 15). She argues that she "does not see how knowing that [Bandele] was allegedly friends with [West Savali] might have discouraged DPA from doing business with [West Savali] or, for that matter, from having [Bandele] be DPA's liaison with [West Savali]." (*Id.*). She also claims that if DPA's position were adopted, then any employee who befriends her employer's contractor or vendor would be obligated to make full disclosure of the friendship to the employer, or risk liability should the employer later find out that another contractor or vendor that would have been willing to do the same work for a lower price or for free. (*See* Pl. Reply 3). *Second*, Bandele contends that The Root's lack of knowledge about the contracts is immaterial because DPA's contracts were with West Savali and not with The Root, and consequently, The Root did not take action against DPA over the contracts, nor was DPA exposed to liability as a result of the contracts. (*See* Pl. Br. 16).

These two arguments fail because Bandele fundamentally misconstrues the nature of the material omissions DPA alleges. The omissions are that Bandele was acting to enrich her friend for personal reasons unrelated to DPA's legitimate business interests. As an example, DPA alleges that the payment under at least one of the contracts was calibrated not to the amount of work West Savali would be doing for DPA, but to the amount of money she would need for a down payment on her car. Thus, the allegations are not just that Bandele had an undisclosed personal friendship with West Savali, but that she

14

squandered DPA's resources to West Savali because of such friendship. Further, Bandele's argument regarding what DPA's position means for employees who befriend vendors or contractors undersells what DPA alleges happened here. DPA's claim is not merely that it could have procured West Savali's services for a lower price, but that the purpose of the contracts — to pay a journalist under the table for press coverage — is antithetical to DPA's mission.

Additionally, Bandele's representations to DPA, or lack thereof, regarding what information The Root knew is relevant to the question of whether the contracts had a legitimate business purpose. These contracts caused West Savali to breach her employment contract with The Root and violate its ethical standards. It is entirely plausible that DPA's actions would have been different had it known that The Root, as the publishing organization, was unaware of the source of its content. Bandele's omissions regarding what The Root knew are, therefore, material. That The Root has not sued DPA does not mean that Bandele's omissions to DPA were immaterial, nor does it mean that DPA was not harmed by Bandele's omissions.

*Third*, and finally, Bandele argues that the "true nature" of the contracts — in other words, that DPA was paying for journalistic coverage — is not actionable. Bandele argues that DPA cannot claim that she failed to disclose the contracts because they were written contracts presented to DPA for approval and DPA, including Brown and Chavez, had full access to them at all times. (*See* Pl. Br. 17). Further, she claims that even if she did fail to disclose

15

the contents of the contracts, DPA has not alleged reasonable reliance because DPA could have learned of the essence of the contracts with relatively little effort. (*See id.* at 17-18). She argues that the counterclaims reveal that DPA was indeed able to ascertain the substance of the contracts with very little effort. (*See id.* at 18).

These arguments also fail. At the outset, the Court notes that even though Bandele was not the employee with final sign-off on the contracts, DPA alleges that Bandele presented the contracts to her supervisors for approval in a manner designed to evade substantive review. That Bandele's supervisors did not go out of their way to scrutinize her work is of no moment — to the contrary, the success of Bandele's fraudulent scheme depended on such inattention.

As DPA points out, Bandele's suggestion that the Executive Director of an organization is required to investigate every contract — rather than rely on the senior executives of the organization — is patently unreasonable. DPA was entitled to rely on Bandele, a senior employee who had been affiliated with the organization for over a decade, to act in the best interests of the organization when carrying out her job functions and spending the organization's money. *See Needham & Co., LLC* v. *Access Staffing, LLC*, No. 15 Civ. 2487 (NRB), 2016 WL 4399288, at *16 (S.D.N.Y. Aug. 12, 2016) ("Reliance on [a] company's own employees to approve invoices in the usual course of business is justifiable."); *Brassco, Inc.* v. *Klipo,* No. 99 Civ. 3014 (PAC), 2006 WL 223154, at *16 (S.D.N.Y. Jan. 27, 2006) ("As Klipo was a trusted employee, Brassco justifiably

relied on Klipo's reports and communications to board directors."); *LaBianca*, 19 F. Supp. 2d at 39 (concluding that plaintiff's reliance on its employee's approval of construction vendors was justified where the "very purpose of their positions in the company was to monitor the hiring of contractors and the construction itself."). Accordingly, DPA has adequately pleaded a fraud claim.

### 2. DPA Has Stated a Claim for Breach of Fiduciary Duty

Under New York law, the elements of a claim for breach of fiduciary duty are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom. *Johnson* v. *Nextel Commc'ns., Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett* v. *Freifeld*, 883 N.Y.S.2d 305, 308 (2d Dep't 2009)). An employee's fiduciary duty to her employer prohibits her from "acting in any manner inconsistent with h[er] agency or trust," and she is "at all times bound to exercise the utmost good faith and loyalty in the performance of h[er] duties." *Lamdin* v. *Broadway Surface Adver. Corp.*, 272 N.Y. 133, 138 (1936); *see also Slue* v. *New York Univ. Med. Ctr.*, 409 F. Supp. 2d 349, 373-74 (S.D.N.Y. 2006). The gravamen of fiduciary duty is "undivided and undiluted loyalty," barring self-dealing, use of confidential information, and other conflicts of interest. *Birnbaum* v. *Birnbaum*, 73 N.Y.2d 461, 466 (1989); *see also CBS Corp.* v. *Dumsday*, 702 N.Y.S.2d 248, 251 (1st Dep't 2000); *LaBianca*, 19 F. Supp. 2d at 40-42 (concluding defendant-employee breached his fiduciary duty to his employer by approving inflated invoices for which he obtained kickbacks).

DPA alleges that: (i) Bandele owed it fiduciary duties as an employee; (ii) Bandele breached her fiduciary duty to it by authorizing DPA assets to be paid to a personal friend for purposes unrelated to any legitimate DPA business purpose; and (iii) as a result of Bandele's conduct, DPA lost tens of thousands of dollars, suffered reputational harm, and potentially may lose future funding. (*See* Countercl. ¶¶ 241-45).

Bandele focuses on the second element, arguing that she did not breach her fiduciary duties to DPA. She claims that: (i) she did not have authority to authorize the payments to West Savali; (ii) Chavez, not she, authorized the payments to West Savali; and (iii) she did not have dominion or control over DPA's funds, as evidenced by her having to submit requests to DPA for reimbursement. (*See* Pl. Br. 19). Accordingly, she argues that because she did not control the flow of DPA's funds, she could not have breached her fiduciary duties to DPA by authorizing the payments. (*See id.* at 20; *see also* Pl. Reply 4-5).

Here, too, Bandele's arguments are too clever by half. The fact that Chavez, rather than Bandele, signed and authorized the contracts to release payment to West Savali does not defeat DPA's breach of fiduciary duty claim. As noted above, DPA alleges that despite presenting the contracts to Chavez for his review, Bandele took other intentional actions to avoid substantive review of the contracts. That DPA may have lacked certain oversight functions that would have prevented the contracts from being executed does not foreclose DPA from proving that Bandele acted in a manner inconsistent with the agency

18

and trust placed in her by DPA.  By negotiating the contracts on behalf of DPA and then taking steps to see that the contracts were executed (even if not by her personally), Bandele breached her fiduciary duties to DPA.

### 3. DPA Has Alleged That It Suffered Damages

At the pre-motion conference in this case (*see* Dkt. #31 at 21:25-22:8), and in Bandele's reply brief (*see* Pl. Reply 5-6), she has argued that because it is undisputed that DPA received services from West Savali pursuant to the contracts, DPA has not adequately alleged that it suffered damages.  Such an argument is wholly without merit.  DPA alleges that Bandele's actions caused DPA to spend thousands of dollars that would have otherwise gone to legitimate business purposes and to suffer reputational harm.  That is all DPA needs to allege at the pleading stage.

### C. The Court Will Exercise Supplemental Jurisdiction Over the Counterclaims

Bandele's remaining argument is that "exceptional circumstances" exist such that the Court should decline to exercise supplemental jurisdiction over DPA's counterclaims.  A court "shall" exercise supplemental jurisdiction if a supplemental claim is related to the claim within the court's original jurisdiction such that they form the same case or controversy.  28 U.S.C. § 1367(a); *see Itar-Tass Russian News Agency* v. *Russian Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir. 1998).  Nonetheless, a court "may" decline to exercise supplemental jurisdiction over a claim in "exceptional circumstances."  28 U.S.C. § 1367(c)(4).  However, such circumstances must be "quite unusual." *Itar-Tass*, 140 F.3d at 448.

The allegedly "exceptional circumstances" cited by Bandele are that:
(i) this case is still in its early stages; (ii) she has a state case, in which DPA
can bring its counterclaims, that may proceed faster; (iii) the state case
includes the same parties as the parties to the counterclaims; (iv) the state
case involves the same questions of fact as the counterclaims; and (v) discovery
in the state case will mirror discovery for the counterclaims. (*See* Pl. Br. 21-
22). These circumstances are far from exceptional.

Bandele chose to file her claims in two separate actions. That is her
prerogative. *Cf. Caterpillar, Inc.* v. *Williams*, 482 U.S. 386, 392 (1987) ("The
rule makes the plaintiff the master of the claim; he or she may avoid federal
jurisdiction by exclusive reliance on state law."). But having chosen to file a
federal case against DPA in federal court, she cannot dictate where DPA
litigates its counterclaims, which are plainly related to the federal claims in this
action. *See Metro Found. Contractors, Inc.* v. *Arch Ins. Co.*, 498 F. App'x 98, 103
(2d Cir. 2012) (summary order) (holding that plaintiff could not assert the
existence of a parallel state court proceeding as a reason for court to decline to
exercise supplemental jurisdiction over counterclaims where plaintiff was
"solely responsible for the existence of the parallel proceedings").

Further, the Court is not moved by Bandele's judicial efficiency
argument. The counterclaims asserted by DPA in this action are intertwined
with the claims asserted by Bandele. Bandele alleges that she was illegally
terminated on the basis of her race and sex. DPA's defense is that it had a
non-discriminatory reason for her termination: the conduct that makes out

DPA's counterclaims.  Because DPA would be using such conduct as a defense to Bandele's claims against it, it makes perfect sense for DPA to bring its counterclaims in this action.  Accordingly, the Court will exercise supplemental jurisdiction over DPA's counterclaims.

## CONCLUSION

For the reasons stated in this Opinion, Bandele's motion to dismiss the counterclaims is DENIED.

On or before January 31, 2020, Bandele shall file a responsive pleading.

On or before February 7, 2020, the parties to this case shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.

The Clerk of Court is directed to terminate the motion at docket entry 33.

SO ORDERED.

Dated:     December 30, 2019
           New York, New York

_____
        KATHERINE POLK FAILLA
       United States District Judge